## YORK v. TRIGG et al.

No. 13168—Opinion Filed July 25, 1922.

Rehearing Denied Oct. 3, 1922.

(Syllabus.)

1. **Appeal and Error—Review—Findings of Fact in Equity Case.**

On appeal in the Supreme Court from a judgment rendered in an action in equity, the findings of fact of the trial court will not be disturbed unless it appears, after a consideration of the entire record of the evidence, that such findings are clearly against the weight of the evidence.

2. **Sufficiency of Evidence.**

Record examined, and held, that the findings of fact of the trial court are not clearly against the weight of the evidence.

3. **Gifts—Inter Vivos—What Constitutes.**

A valid gift "inter vivos" is an absolute transfer of the property from the donor to the donee, taking effect immediately on a delivery of the property, the subject of the gift, to the donee and its acceptance.

4. **Same—Distinguished From Will.**

A gift "inter vivos" is distinguishable from a will in that such a gift may be made by parol, and upon the acceptance of the gift by the donee, the gift is irrevocable by the donor, while ordinarily a will is required to be in writing and usually is made in view of the fact of death, and is ineffective until the death of the testator and the admission of the will to probate.

5. **Gifts—Inter Vivos—Gift by Married Man**

A married man may during his lifetime give away his property, both personal and real, acquired during coverture, except the homestead, and such gift will be binding against his widow as an heir of his estate unless it be shown that the gift was made in fraud of the marital rights of the surviving widow, and section 8341 of Revised Laws 1910, prohibiting a married man from bequeathing more than two-thirds of his property away from his wife, in no way limits or restricts him in making such gifts.

6. **Wills—Invalid Provision—Disinheriting Wife—Statutory Construction.**

Under section 8341, Revised Laws 1910, a will by a married man, which bequeaths more than two-thirds of the testator's property away from his wife is invalid as to his wife, and such surviving wife has the right to elect whether she will take under the will or receive her distributive share of such deceased testator's property with which he died seized as an heir at law.

7. **Equity—Equitable Jurisdiction—Maxims of Equity.**

Where the rights of parties to an action are clearly defined and established by law, equity has no power to change or unsettle such rights. The maxims of equity may be invoked to protect an existing right, but are unavailable to create a right where none exists. Equity follows the law.

Record examined, and held, that the judgment of the trial court must be affirmed.

Error from District Court, McCurtain County; Harve L. Melton, Judge.

Action by Elizabeth York against Mary Y. Trigg and Robert York to establish title and interest in the property belonging to the estate of Jerome B. York, deceased, and for the cancellation of certain conveyances. Judgment for the defendants. Plaintiff brings error. Affirmed.

Etheredge & Arnett and Rainey & Flynn (Fitzhugh, Murrah & Fitshugh, Ewing, King & King, and M. Danaher, of counsel), for plaintiff in error.

Harsh & Harsh, Armstrong & Jones, and McPherren & Cochran, for defendants in error.

KENNAMER, J. Elizabeth York, plaintiff. commenced this action in the district court of McCurtain county on the 30th day of December, 1919, against Mary Y. Trigg and Robert York, defendants, to establish her ownership and title in and to an undivided one-third interest in the estate of Jerome B. York, deceased, and to have canceled, set aside, and held for naught certain deeds and instruments of writing by which Jerome B. York attempted to convey, give,

devise, and bequeath certain real and personal property to the defendants.

The material allegations of the petition, in substance, are: That Jerome B. York died in the city of Paris, Lamar county, state of Texas, on about the 6th day of July, 1919, but that on the date of his death he was a resident of the town of Valliant, McCurtain county, state of Oklahoma.

That Mary Y. Trigg and Robert York had been by the county court of McCurtain county appointed executrix and executor of the estate of Jerome B. York, deceased, and are now qualified and acting executrix and executor of said estate.

That the plaintiff, Elizabeth York, and the said Jerome B. York were legally married on the 12th day of May, 1870, in the state of Illinois. That the plaintiff and Jerome B. York lived in the state of Illinois until 1871, when they moved to the city of Wichita, Kan., where they lived until 1893, when they moved to the city of Pine Bluff, Ark., and resided there until 1908, when they moved to the city of Memphis, Tenn., and lived together as husband and wife until 1912, when Jerome B. York left the city of Memphis and took up his residence in the town of Valliant, McCurtain county, Okla.

That of the marriage of the plaintiff and Jerome B. York there were born six children, names as follows: Mary Y. Trigg, nee York, a daughter, one of the defendants; Robert York, a son, one of the defendants herein; Grace Nelson, nee York, a daughter; Minnie Anderson, nee York, a daughter, who died subsequent to the death of the said Jerome B. York; and two children who died in infancy.

That at the time of the marriage of the plaintiff and Jerome B. York neither of them had any property.

That after the marriage of the plaintiff and Jerome B. York they each labored and worked together, using their best efforts, skill, and mental accomplishments to accumulate property, real and personal, to provide for their support, maintenance, and to provide for the education, maintenance, and support of their children.

That all of the property acquired subsequent to the marriage of the plaintiff and Jerome B. York held in the name of Jerome B. York or any person for his use and benefit, was accumulated, acquired, earned owned, and purchased by the joint industry, efforts, and labor of the plaintiff and the said Jerome B. York.

During the year 1911 the said Jerome B. York and the two defendants herein entered into a conspiracy to cheat and defraud this plaintiff out of her share and part of the property, real, personal, mixed, acquired, owned, and accumulated by plaintiff and Jerome B. York during their marriage relation, and to defraud the plaintiff by depriving her of her right to inherit or take any part of said property from her husband on his death, either by the law of descent or by will.

That, acting in pursuance of said conspiracy to cheat and defraud plaintiff of her part and share of the property and to overreach the said Jerome B. York, the defendants, by fraudulent statements and representations and false and fabricated offers of reward, did during the year 1911 have this plaintiff incarcerated in an insane asylum in the city of Flint, Mich., where she was confined and deprived of her liberty until, with the aid of her two daughters, Grace Nelson, nee York, and Minnie Anderson, nee York, she managed to escape and return to her home in Memphis, Tenn.

That in pursuance of the conspiracy to cheat and defraud plaintiff out of her share and part of the property acquired, owned, and accumulated by the joint efforts and industry of plaintiff and Jerome B. York, and to deprive plaintiff of her right to inherit as a wife and heir at law of Jerome B. York at his death, the said Jerome B. York converted a large part of said property into cash and invested the same in lands situated in McCurtain county, Okla., and had the title, deeds to the lands, made in the name of the defendants, Mary Y. Trigg and Robert York. But the said Jerome B. York invested a large amount of money in corporation stock, chattels, goods, wares, and merchandise, taking title to said property in the name of the defendants, the amount and value of the same being unknown to the plaintiff.

That in furtherance of said conspiracy to defraud the plaintiff, Jerome B. York and the defendants placed the title of said property in such a condition as to have the title in the defendants at the date of the death of the said Jerome B. York and in order to avoid the statute of the state of Oklahoma prohibiting Jerome B. York from willing and giving away from his wife more than two-thirds of his property. Jerome B. York did attempt to give and convey to the defendants practically all of his real estate and personal property by deeds and conveyances. (A description of the prop-

erty being set out.) That the value of the property described was unknown to the plaintiff, but alleged to be of the value of $500,000.

That Jerome B. York attempted to make a will and testament, devising and bequeathing to the defendants all of the personal, real, and mixed property acquired by the joint industry of the plaintiff. That Jerome B. York, during their marriage relation attempted to devise, bequeath, and will away from plaintiff more than two-thirds of the property owned by Jerome B. York at the time of his death, and attempted to bequeath to the plaintiff an annuity of $300 per month during her lifetime. Said will had been allowed to probate by the county court of McCurtain county, Okla., and the defendants appointed and qualified as executrix and executor thereunder.

That at the time of the death of Jerome B. York he had in his name and under his control real and personal property, owned, acquired, and accumulated by the joint industry of the plaintiff and Jerome B. York, of the value of $2,000,000.

That at the time of the death of Jerome B. York the defendants held in their name, in trust and for the use and benefit of Jerome B. York, real and personal property of the value of $2,000,000.

That all of the conveyances, gifts, devises, and bequests made by Jerome B. York to the defendants, or either of them, were as to plaintiff void and of no effect.

The plaintiff prayed the judgment of the court be to require that the defendants disclose and reveal to the court all property, real and personal, which Jerome B. York gave, conveyed, devised, bequeathed, sold, or transferred to them, or either of them; at any time subsequent to the marriage of plaintiff and Jerome B. York. That the plaintiff be adjudged to be the owner of one-third of all the property owned by Jerome B. York; and for all proper and equitable relief deemed to be just and right.

The defendants answered the petition of the plaintiff, denying generally all of the allegations pleading a conspiracy to defraud the plaintiff; alleged that on the date of the marriage of Jerome B. York he had property of the value of $3,000; alleged that in the beginning of the married life of the plaintiff and Jerome B. York the plaintiff did the usual and customary duties that a wife does at home, but de-

nied that she ever helped him any way in his business; alleged that in the early married life of the plaintiff and Jerome B. York the plaintiff had nervous prostration and that some years after their marriage she developtd a goitre on her neck. That many years prior to the death of Jerome B. York the plaintiff was not in a condition to attend to the ordinary household duties. That the property accumulated was solely by Jerome B. York.

It was alleged by the defendants that the goitre on the neck of the plaintiff, more than 30 years prior to the death of Jerome B. York, had developed to such an extent that according to the opinion of eminent physicians caused the mind of the plaintiff to be affected. That the plaintiff imagined that she had some supernatural power or insight, and began to try to regulate the Baptist church, of which she was a member, and finally created such disturbances at the Baptist church at Pine Bluff, Ark., where she worshiped, that it became very embarrassing to the members of the church, and that Jerome B. York, at the request of the members of the church that something must be done to restrain his wife, together with the other members of the family, agreed that it was best that the plaintiff be treated by some competent nerve and mind specialist. Thereupon she was taken to Cincinnati Sanitarium of Ohio, where she was treated.

The answer in detail alleged the confinement and treatment of the plaintiff in the Cincinnati Sanitarium at different times until October 13, 1908; the removal of the family from Pine Bluff, Ark., to Memphis, Tenn., and the sending of the plaintiff from Memphis, Tenn., to Oak Grove Sanitarium at Flint, Mich., upon the recommendation of two or more eminent specialists in mental and nervous diseases.

The defendants alleged that the plaintiff remained at Oak Grove Sanitarium for treatment until she was clandestinely taken from the sanitarium in July, 1913, by her daughter, Mrs. Charles Nelson, of Louisville, Ky., against the advice of the physicians in charge of the sanitarium.

The answer alleged that Jerome B. York at all times had uppermost in his mind the idea of always providing for his wife, the plaintiff, and arranging it so that his wife would have every comfort and care as long as she lived; with this end in view, devised to respondents, in whom Jerome B. York had implicit confidence, and knowing, too, that the respondents had great love for

their mother and would do everything in their power for her comfort, $70,000 in trust, as shown by his will, to be invested by his executors in a safe way for her benefit, and from the income of same to pay plaintiff the sum of $300 per month, or such sum as might be needed to provide for her every comfort and attention.

That on the 25th day of January, 1918, Jerome B. York conveyed certain personal property and real estate to the defendants for certain valuable and monetary consideration and for the love and affection which he had for them. A copy of the conveyance being attached to the answer as an exhibit.

The answer in great length detailed the transactions between the defendants and Jerome B. York, deceased, during his lifetime, and prayed the judgment of the court dismissing the plaintiff's petition, and that the defendants title to the property involved be quieted against any claims of the plaintiff, and for all proper equitable relief.

The plaintiff filed a reply, denying generally the affirmative allegations of the defendants' answer, and alleged that the instruments attached as exhibits to the defendants' answer, being the deeds and conveyances by which Jerome B. York conveyed to the defendants the property in controversy, were executed without consideration other than a nominal consideration and were executed by Jerome B. York as alleged in the petition of the plaintiff; that said instruments were executed while under the undue influence exercised over Jerome B. York by the defendants.

On the 9th day of September, 1921, the court, after having heard the evidence of the respective parties to said action, found the issues made under the pleadings in favor of the defendants and entered judgment decreeing that plaintiff's petition be dismissed. A timely motion for new trial was filed by the plaintiff, which was by the trial court overruled, exceptions allowed, and the plaintiff prosecutes this appeal to reverse the order of the trial court denying her motion for a new trial and to vacate the judgment. Numerous errors of assignment have been assigned as grounds for reversal of the judgment of the trial court.

On an examination of the record in this cause two questions are presented that appear to be decisive of this appeal. The first is, this being an equitable action, whether the judgment of the trial court is clearly against the weight of the evidence. The second, the legal question, is expressed in the language of the counsel for the plaintiff, as follows:

"Can a married man, by gift inter vivos, give away personal and real property acquired during coverture by the joint industry of himself and wife, and thus defeat his wife of any interest in such property?"

The record of the evidence introduced on the trial of this cause is quite voluminous. Numerous witnesses testified orally and by deposition, many instruments of writing consisting of deeds, conveyances, and transfers of property and many letters of correspondence were placed in evidence by the respective parties.

It is clearly established by the evidence introduced that Jerome B. York, husband of the plaintiff, was a man of extraordinary business ability, intelligent, competent, and successful as a business man. That during his active business career for about one-half century he accumulated an estate of the value of several hundred thousand dollars. It does not appear from the evidence, at the time he made the gifts and conveyances of his property in controversy just what amount of property he owned. He owned several thousand acres of real estate located in Tennessee, Mississippi, and Oklahoma, of which there is no evidence as to the value. On the date of these gifts and conveyances to the defendants and date of the will, it is quite clear that he must have had an estate of the value of more than a half-million dollars.

The evidence unquestionably establishes the fact that in the year 1901, while the plaintiff and her husband, Jerome B. York, resided in the city of Pine Bluff, Ark., the plaintiff's mind became affected to such an extent that it was the unanimous opinion of the entire York family and physicians, whose integrity and ability is unquestionable, that the plaintiff be sent to a sanitarium for treatment. After proper consideration of the matter by the family, the plaintiff was sent to the Cincinnati Sanitarium, of Cincinnati, Ohio, for treatment, and was treated at this sanitarium at different times until some time in the year 1908. In the year 1908 the family moved to Memphis, Tenn. While living there in the year 1911 it became necessary to send the plaintiff to a sanitarium for treatment again by reason of her mental condition. She was sent to Oak Grove Sanitarium at Flint, Mich., for treatment, where she remained until she was abducted from the sanitarium by her daughter Grace York Nelson, some time in the year 1913. After her abduction from the sanitarium at Flint,

Mich., in 1913, she instituted a divorce action at Memphis, Tenn., against her husband, Jerome B. York, in which she charged Jerome B. Work with immorality and other charges of a very serious nature.

It appears that the two daughters, Grace York Nelson and Minnie York Anderson, were responsible for the abduction of the plaintiff from the sanitarium and the institution of the divorce action. It is apparent from the evidence that Jerome B. York was very much hurt and grieved over the abduction of his wife from the sanitarium and the institution of the divorce action. That the divorce action came on for trial in the year 1914 at Memphis, Tenn., and that the two daughters, Grace York Nelson and Minnie York Anderson, took a very active part against their father, Jerome B. York, in the trial of the cause. The action was dismissed after the introduction of the evidence on behalf of Elizabeth York.

The evidence plainly establishes the fact that after Elizabeth York became mentally deficient and affected by insane delusions, she had a fixed hatred and aversion for her husband, Jerome B. York, and it was impossible for him to reside with her as her husband.

That after Grace York Nelson abducted her mother from the sanitarium she planned to keep her with her in her home in Louisville, Ky. That before removing her mother from the sanitarium she had written her father that she would keep her mother for $3,000 per year; but after she removed her mother from the sanitarium she demanded that her father pay her mother $50,000 in cash and $500 per month, to which demand Jerome B. York made the following reply:

"Mrs. C. L. Nelson,

"Louisville, Ky.

"Dear Daughter:

"I am so as to be up most of the time but am not well but think if I am careful of myself for a few days I will be all right. I have thought carefully over your proposition that I pay your mother fifty thousand in cash and five hundred per month and I see no reason why I should do this. If she is ever well I of course will want her to be with me that is if she ever gets in a condition where it would be wise to keep her out of a sanitarium but as long as she is in the condition that Dr. Burr writes me that she is in I do not think it best for her to be away from a sanitarium under the care of a competent doctor. However, if she seems to be satisfied with you and you are in a position to take good care of her in every way I am willing for her to stay with you until she shows signs of growing worse for want of proper sanitarium treatment.

"Of course while she is with you I want to pay all proper expenses for her comfort care and attention you will have to be very careful with her in every way and let me know if she becomes dissatisfied. I will pay the bills which you have already sent to me on her account and herewith enclose you my check for $150 to be used for her comfort and support and I will remit you from time to time while she is with you money to cover her board and all other expenses.

"You will please not charge anything to me but let me know when anything is needed or when she needs money and I will send it.

"Hoping you & Mr. Nelson arrived home safe and found all well.

"As ever your Father,

"(Signed) J. B. York"

On October 24, 1913, replying to the letter of Mrs. Grace York Nelson of October 20th, the following paragraphs of Mr. York's letter to his daughter show the attitude of Mr. York towards his daughter with reference to her demands upon him for the care of his wife, Mrs. Elizabeth York:

"I received your letter of Oct. 20th. It seems to me that you are trying in every way possible to embarrass and annoy me.

"As soon as you got your mother out of the sanitarium where she was being treated for mental disorder, and got her in your custody, you and your husband made most unreasonable demands upon me. You first demanded that I pay into the hands of your mother $50,000, and pay her $500 per month in addition, though you knew she had been declared of unsound mind.

"After I declined this most unreasonable proposition, you, it seems, have tried to make a statement of what your mother's expenses would be at your home, and have made it so large that it is out of all reason. * * *

"I have already written you just what I will do for your mother while she is with you; it is unnecessary for me to repeat it. No doubt, you have my letters and you can read them over.

"I have not been very well and expect to go away for sometime. I do not know just where I will go, but I will make proper provision for your mother before I go, and have the money sent to you at intervals while she is with you.

"You will regret some day your conduct and the ugly letters that you have been writing me, and I want to say that I will have no more of this. If you write me one more letter, such as you have been writing

then all communication between you and me will be cut off. I will **not receive any** communication from you, but will return all letters unopened, and will not communicate with you in any way."

The evidence to our minds conclusively shows that Grace York Nelson was using her mother, while in a demented condition of mind, as a means to obtain unreasonable sums of money from her father, and that when she failed she caused the institution of a divorce action by her mother against her father.

The evidence of Mrs. Lewis Miller, sister of Elizabeth York, and James M. Bowman, brother of Mrs. Elizabeth York, who attended the divorce trial in Memphis in 1914, with regard to statements made by Jerome B. York in respect to his attitude towards Grace York Nelson and Minnie York Anderson clearly establishes the fact that, because of the treatment of his daughters toward him in attacking his character and in humiliating him by the divorce action and numerous insulting letters written to him by these daughters, he had firmly resolved in his mind that these two daughters should not be the beneficiaries of his estate upon his death. In a letter written by him on May 8, 1919, to his son, Robert, he plainly expressed the thought that he would not soon forget the treatment he had received from them.

The evidence shows that after November, 1914, Jerome B. York, feeling so keenly with humiliation the things he had suffered by reason of the conduct of his two daughters toward him, refused to communicate with them or receive their letters from the post office which they would write him.

Prior to the divorce action, in 1914, Jerome B. York had made two different wills in which he provided that his four children share equally in his property after making provision for the support of his wife in the sum of $60.000. The evidence shows that after the divorce action had been dismissed, Jerome B. York returned to his home at Valliant, Okla., and executed his last will and testament on December 12, 1914, in which he bequeathed in trust for his wife, Elizabeth York, for and during her natural life, the sum of $70,000, naming Robert York and Mary York Trigg as trustees; said sum to be invested by them in a safe way for the benefit of his wife, and from the income of the same he directed that they pay to her for her support the sum of $300 per month, or such sums as might be needed to provide for her every comfort and attention. By the

will he bequeathed to Minnie York Anderson $500 and Grace York Nelson $100. After making other minor bequests to other relatives, such as grandchildren, he bequeathed the residue, rest, and remainder of his estate, both real and personal, to Mary York Trigg and Robert York in equal shares.

Subsequent to the execution of this will, in the year 1916, Jerome B. York deeded to Mary York Trigg and Robert York certain real estate. Thereafter, on the 25th day of January, 1918, by an instrument in writing he made gifts to Mary York Trigg, his daughter, and Robert York, his son, by which he gave them a large portion of his estate, consisting of shares of stock in the York Lumber & Manufacturing Company and numerous other companies; several thousand dollars in cash; bonds; notes and a considerable parcel of real estate.

On the date of the death of Jerome B. York he was seized of an estate valued at from $100,000 to $150,000.

The evidence discloses that prior to the institution of the divorce action and before Jerome B. York decided to disinherit his two daughters, Grace York Nelson and Minnie York Anderson, he had been a kind and indulgent father towards his children. He at one time made a gift to each of his four children of about $20.000. We are unable to concur in the view of counsel for the plaintiff that the gifts made to Mary York Trigg and Robert York, in the year of 1916 and 1918, were obtained by the defendants through undue influence or fraud, but that the gifts were the free and voluntary acts of an intelligent man of strong personal character, and that the judgment of the trial court in this respect is amply supported by the evidence introduced in the trial of the cause. The rule is, in actions in equity the judgment of the trial court will not be reversed unless the judgment is against the clear weight of the evidence. Hogan et al. v. Grimes et al., 78 Okla. 184, 189 Pac. 352; Jones v. Thompson, 55 Okla. 25, 154 Pac. 1139; Miller v. Howard, 76 Okla. 237, 184 Pac. 773; Haynes v. Gaines, 76 Okla. 233, 185 Pac. 74.

It is admitted that the will of Jerome B. York, under section 8341 of Revised Laws 1910, is void as to the wife of Jerome B. York, the plaintiff in this action. The statute prohibits the husband or wife from willing away from the other more than two-thirds of their property. In this situation it is obvious that the wife has the right to elect to take under the will or share as an heir one-third of all of the estate of which

the deceased was seized on the date of his death.

The gifts made by Jerome B. York to his children, Mary York Trigg and Robert York, were made in the years 1916 and 1918 by proper conveyances in writing, acknowledged and recorded according to law, and an actual delivery of the property made to the donees. The evidence discloses that the donees took the actual possession of the property. The last gifts were made on January 25, 1918, more than 18 months prior to the death of the donor, and under the universal rule adhered to by the authorities everything was done necessary to constitute a valid gift inter vivos.

The legal question presented and argued by counsel for plaintiff is that, Jerome B. York being prohibited by section 8341, Revised Laws 1910, from bequeathing by will more than two-thirds of his property away from his wife, he cannot do indirectly by gifts that which he is prohibited from doing by a testamentary disposition of his property. This position is untenable, and this court has decided the question adversely to the contention made by counsel for the plaintiff. In the case of Garrison v. Spencer et al., 58 Okla. 442, 160 Pac. 493, in the first paragraph of the syllabus, this court held:

"A married man may during his lifetime, give away his separate property, and such gift will be valid and binding against his widow, where she is not a creditor within the contemplation of the statute against fraudulent conveyances."

In this case the court adhered to the rule announced in Farrell v. Puthoff, 13 Okla. 159, 74 Pac. 96, where the rule was announced as follows:

"A married man during his lifetime may give away his separate property real or personal and such gift will be valid and binding as against his lawful heirs after his death and where the effect of such gift is not to defraud his creditors, the administrator of his estate cannot maintain an action to recover the property so transferred."

This court in Farrell v. Puthoff approved the rule announced in Williams v. Williams, 40 Fed. 521, where the Circuit Court of the United States said:

"The main question, in its broadest sense, is simply this: can a married man give away his property, during coverture, for the purpose of preventing his wife from acquiring an interest therein after his death? The law seems to be that if such gift is bona fide, and accompanied by delivery, the widow cannot reach the property after the donor's death.* * * Neither the wife nor children have any tangible interest in the property of the husband or father during his lifetime, except so far as he is liable for their support, and hence he can sell it or give it away without let or hindrance from them. Of course the sale or gift must be absolute and bona fide, and not colorable only. And if the sale or gift would bind the grantor, it would bind his heirs."

The rule under the common law was, under the statutes where the wife had the right of dower in the land of her husband and the right had once attached, the husband could not by gifts deprive the wife of her dower interest in the lands. But under rights of inheritance conferred upon the wife by statute, the rule is that the husband may, during his lifetime, by gifts or conveyances made in good faith without any intention of defrauding the wife, transfer his real or personal property. 18 C. J. sec. 114; Samson v. Samson, 67 Iowa, 259, 25 N. W. 233.

In the case of Samson v. Samson, supra, the same contention was made against the right to make a gift by reason of the prohibition in the statute against bequeathing property by will, as is argued here, and the court in disposing of the contention said:

"It is finally contended that said gift is void as against public policy. By the transaction the deceased was divested of much the greater part of his estate; and the argument of counsel is that, as the husband cannot by will divest his widow of the distributive share which the law gives her in his estate, he should not be permitted to accomplish that result by distributing it during his lifetime to his heirs. The ready answer to this claim is that it is in the personal property of which the husband dies seized that the law gives the widow a distributive share. Code (1873) section 2436. But during his lifetime she had no inchoate right in such property, and he may make such disposition of it during his lifetime as he sees fit. If he sells it, or makes any other disposition of it by which he is divested of the ownership, the wife has no claim upon it after his death. The law has placed no restriction or limitation on the power of the husband to make such disposition of his personal property during his lifetime as he may elect."

In the case of Vosburg v. Mallory et al., 155 Iowa, 165, 135 N. W. 577, the Supreme Court of Iowa adhered to the rule announced in Samson v. Samson, supra. In this state, under section 8419, dower and courtesy were abolished and the wife's interest in her husband's property, both personal and real, is by inheritance.

It must be observed that there exists a well defined distinction between a gift inter vivos and a testamentary disposition of property. A gift inter vivos is complete upon a delivery by the donor of the property to the donee during the life of the donor, and the property passes absolutely to the donee. It is unnecessary to the validity of a gift that it be made under the same formalities that are required under the statutes for the execution of a valid will. A valid gift may be made by parol and a delivery of the property, and the title of the same thereby passes to the donee irrevocably. But in the disposition of property by will the testator may revoke the will at his pleasure, and the same does not become operative or effective until the death of the testator and its probation.

Many authorities hold that a donatio mortis causa is in form a testamentary disposition, for the reason it is revocable during the donor's life and on his death, if there be a deficiency of his assets, the subject of his gift is subject to his debts and does not become an 'absolute gift until the donor's death. Jones v. Brown, 34 N. H. 439; Baker v. Smith, 66 N. H. 422, 23 Atl. 82; Scheuler, Personal Property, 138. But other authorities hold that while a donatio mortis causa resembles in certain particulars a testamentary disposition, still it is distinguishable as to the subject-matter of the gift in that the gift is delivered to the donee during the life of the donor, and that the property at the death of the donor does not pass into the hands of the executor, or administrator, but remains with the donee. In this species of gift, on the death of the donor the donee takes the title to the property instead of the heirs, according to the intention of the donor, as expressed during his lifetime by delivering the property to the donee, although he may have reserved to himself the income from such property during his lifetime. Vosburg v. Mallory et al., supra; Conner v. Root, 11 Colo. 183, 17 Pac. 773; Marshall v. Barry, 13 Allen (Mass.) 43.

It would undoubtedly require a strained and unwarranted construction of section 8341, Revised Laws 1910, prohibiting the husband from bequeathing more than two-thirds of his property away from his wife, to construe it as providing a prohibition or restriction against a married man disposing of his property by conveyance, gift, or otherwise during his lifetime. The statute is not susceptible of such construction.

Under section 3351 of Revised Laws 1910, the husband owes the duty to his wife of supporting her out of his property. It is plain that the only claim or interest that the wife has against the property of her husband during his lifetime is that it is liable for her proper support. It appears from the evidence in the case at bar that Jerome B. York during his lifetime at all times amply provided for the support of his wife, the plaintiff in this action. In his will he made adequate provisions for her support. Should she elect not to take under the will, she would inherit a one-third interest in the estate of her deceased husband, valued at from $100,000 to $150,000. Under no view of the facts can it be said that the deceased failed to discharge any marital duty that he owed to the plaintiff in this action during the existence of such relation. Any conveyance or gift by the husband of his property not in fraud of the marital rights of his wife is valid as to her.

The evidence in this action clearly establishes the fact that for 30 years prior to the death of Jerome B. York his wife, the plaintiff in this action, by reason of being insane, was wholly mentally incompetent to transact the ordinary business affairs of life, and if the contention of counsel for the plaintiff is to be sustained, that Jerome B. York was restricted in the conveyance or transfer of his property, it would have been necessary for him, in order to carry on the ordinary transactions with reference to his property, to have had a guardian appointed for his wife as an incompetent, and in all sales and conveyances of such property had the guardian of his wife join in such sales and conveyances under proper orders of the probate court. We are clearly of the opinion that there was no restriction or limitation upon Jerome B. York in disposing of his property during his lifetime in the absence of fraud. Small v. Small, 56 Kan. 1, 42 Pac. 323; Walker v. Walker (N. H.) 31 Atl. 14; Dehe v. Huenheimer, 286 Ill. 148, 124 N. E. 381; Hall v. Hall, 63 S. E. (Va.) 420, 21 L. R. A. (N. S.) 533; Dudley v. Dudley. 76 Wis. 567. 45 N. W. 605. 8 L. R. A. 814; Robertson, Adm., v. Robertson (Ala.) 40 So. 104, 3 L. R. A. (N. S.) 774.

Counsel for the plaintiff contend that the case of In re Estate of Stone, 86 Okla. 33, 206 Pac. 246, and the case of Davis v. Davis, 61 Okla. 275, 161 Pac. 191. support their contention that the plaintiff had a tangible vested interest in the property of Jerome B. York during his lifetime. We cannot agree with counsel that these cases support their position.

In the Stone Case the court was construing the second paragraph of section 8418, Revised Laws 1910, wherein it is provided that if the decedent leaves no issue the estate goes one-half to the surviving husband or wife and the remaining one-half to the decedent's father or mother unless the property was acquired by the joint industry of the husband and wife during coverture, then in that event, the whole estate should go to the survivor. The statute has no application to a case except where there is no issue.

In Davis v. Davis, supra, the question involved was the jurisdiction of the district court where the husband and wife were living separate and apart but neither had sufficient grounds upon which to secure a divorce. It was held under section 4966 of Revised Laws 1910 the court was vested with jurisdiction to make an equitable division of the property of the parties or of either of them. It is true that the court used the language, if the property had been acquired during the wedded life of the parties by their joint effort, the wife had a vested interest in such property which she does not forfeit even though her conduct cannot be justified. The question as to the interest of the wife in property acquired during coverture was not a material question in the case, and we are of the opinion the phrase "vested interest" was not used in the sense as contended for by counsel for the plaintiff. It is clear that the wife had no vested interest in the property until the court had decreed her title to her equitable portion of the property as provided for in the statute. While it is true that courts of equity will be vigilant in protecting the rights of an abandoned wife, or one compelled to live separate and apart from her husband for good cause, in decreeing to her an equitable division of her husband's property with a view of having the husband discharge his legal obligation to support his wife, it is quite obvious that the legal right of the wife to this protection in no way conflicts with the rule of law that grants to the husband the unrestricted right to deal with the property acquired during coverture unless it be such property as a homestead, which the law protects against conveyances without the consent of the wife.

It is for the Legislature to enact laws, and thereby establish the public policy of the state. The Legislature of this state has not deemed it advisable to restrict the husband in the conveyance or disposition of property acquired by him during coverture except as to the homestead. There being no statutory prohibition against the husband conveying such property, to hold that there is a restriction against the alienation of the same would be to establish a limitation upon the right by judicial decree. Such a precedent would be unjustifiable upon any ground, and a most dangerous precedent. It is the imperative duty of courts to declare the law as enacted by the Legislature in determining the property rights of litigants. The law is fundamental that an expectant heir has no vested interest or estate in property which he may subsequently inherit. In re Barnes Estate, 47 Okla. 117, 147 Pac. 504; In re Pigeon's Estate, 81 Okla. 180, 198 Pac. 309; 18 C. J. sec. 111.

Counsel for plaintiff have invoked the following maxims of equity:

"Equity will not suffer a wrong to be without a remedy";

"Equity serves to do justice, and not by halves";

"Equity regards substance rather than form";

"Equity regards that as done which ought to have been done."

These splendid maxims can have no place in the instant case, for the obvious reason that the respective rights of the parties to this action are clearly defined and established by law. No court is ever justified in invoking the maxim of equity for the purpose of destroying legal rights or of establishing rights that do not exist. The maxims above quoted are useful only to the court in protecting a right that really exists. It is a maxim of equity uniformly adhered to by the courts that "equity follows the law."

The Supreme Court of the United States, in Magniac v. Thompson, 56 U. S. (15 How.) 299, said:

"That wherever the rights of the situation of parties are clearly defined and established by law, equity has no power to change or unsettle those rights or that situation, but in all such instances the maxim equitas sequitur legem is strictly applicable."

In Hedges v. Dixon, 150 U. S. 182, 37 L. Ed. 1044, the Supreme Court of the United States said:

"A court of equity, in the absence of fraud, accident, or mistake, cannot change the terms of a contract."

Jerome B. York, who was a man of strong personal character and an intelligent business man, executed the conveyances and contracts sought to be avoided in this case.

The trial court having determined, after hearing numerous witnesses testify, that the deeds and contracts executed expressed the free and voluntary acts of Jerome B. York. the judgment o fthe trial court, not being clearly against the weight of the evidence, is affirmed.

PITCHFORD, V. C. J., and JOHNSON, McNEILL. and ELTING, JJ., concur.